UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

---

ZINO DAVIDOFF SA,

                      Plaintiff,

   -v-

CVS CORPORATION,

                      Defendant.

Case No. 06-CV-15332 (KMK)

AMENDED OPINION & ORDER[1]

Appearances:

Lisa Pearson, Esq.
Christopher S. Lick, Esq.
Kilpatrick Stockton LLP
New York, New York
*Counsel for Plaintiff*

Nicholas J. Fortuna, Esq.
Megan Muoio, Esq.
Allyn & Fortuna, LLP
New York, New York
*Counsel for Defendant*

KENNETH M. KARAS, District Judge:

      Zino Davidoff SA ("Davidoff"), a joint stock company organized under the laws of Switzerland, brings this action against CVS Corporation ("CVS"), alleging trademark infringement in violation of sections 32(1), 43(a), and 43(c) of the Trademark Act of 1946 (the

---

[1] The original Opinion & Order issued with respect to this Motion was filed under seal in order to provide the Parties with the opportunity to redact confidential information. After reviewing that Opinion & Order, the Parties chose to make no redactions. However, in response to a request from Plaintiff, the Court added footnote three, below, which corrects an error in the hearing transcript. Accordingly, this Amended Opinion & Order differs from the initial Opinion & Order only by virtue of that footnote.

"Lanham Act"), as codified at 15 U.S.C. §§ 1114(1), 1125(a), 1125(c), as well as several state trademark claims. On December 22, 2006, the Court issued a temporary restraining order (the "TRO"), which prohibited CVS from selling counterfeit goods and required CVS to hold aside for Davidoff's inspection certain Davidoff products. The TRO was extended on CVS's consent and remains in effect. Davidoff now seeks to replace the TRO with a preliminary injunction enjoining CVS from selling any counterfeit and certain gray-market Davidoff goods. CVS does not oppose an injunction prohibiting the sale of counterfeit goods; however, CVS argues that it has a right to sell the disputed gray-market Davidoff products so long as those products are not counterfeit.

The Court held a preliminary injunction hearing on May 14 and 15, 2007. During that hearing, the Court heard testimony from Guido Baumgartner, Hans-Jurgen Weissgraeber, Erich Joachimsthaler, James Duggan, and Marie-Josee Rivard. With the agreement of the Parties, direct examination was largely conducted by affidavit. The Court finds that all of the witnesses were credible.

For the reasons stated herein, Plaintiff's application for a preliminary injunction is GRANTED.

## I.  FINDINGS OF FACT

A.  The Davidoff Fragrances

Zino Davidoff created the Davidoff brand in 1911, in Geneva, Switzerland. (Am. Compl. ¶ 8.) In 1991, Davidoff launched its DAVIDOFF COOL WATER ("COOL WATER") cologne for men, which was followed, in 1997, by a women's COOL WATER fragrance. (*Id.* ¶ 9.) Davidoff's COOL WATER fragrances are considered "prestige" products, and, as such, they

command a price premium over their competitors due in part to the value of the Davidoff brand name.  (Joachimsthaler Aff. ¶¶ 17-18, 31.)  It is undisputed that Davidoff holds valid trademarks for all of the COOL WATER products at issue.  (Stipulation, May 2, 2007, ¶¶ 3-4.)

        B.  Davidoff's Quality Control Procedures

Coty Inc., through its affiliates and subsidiaries, is the primary authorized distributor of Davidoff fragrances in the United States.  (Weissgraeber Aff. ¶ 1.)  Together with Davidoff, Coty Inc. exercises "strict quality control over [Davidoff's] fragrance products."  (*Id.* ¶ 4.)  Davidoff and Coty Inc.'s quality control procedures take place at three stages:  i) the development of the formula; ii) the production of the product; and iii) the packaging of the product.  (*Id.* ¶ 7.)  It is the quality control procedures related to Davidoff's product packaging that are at issue here.

With respect to packaging, one means by which Davidoff assures quality is through its coding system.  Davidoff applies "a unique numeric production code [the "Unique Production Code" or "UPC"] . . . or a numeric batch code . . . to each unit to permit [Davidoff] to trace and resolve quality issues."  (*Id.* ¶ 5.)  The batch code is a non-unique number that, as the name suggests, identifies the batch from which each particular unit was produced.  While the batch code provides some limited information about the product, it does not uniquely identify each unit, as hundreds of units may contain the same batch code.  (Hr'g Tr. 48.)  The Unique Production Code, in contrast, is a longer number that is unique to each individual unit.  Embedded in the UPC is information such as the date of the product's production – "down to the very second [the bottle] has been filled" (*id.* at 39) – the ingredients used to produce the product, the production line from which it came, and the distribution chain "from the factory . . . down to the customer."  (*Id.*)  Davidoff uses Unique Production Codes on all of its luxury brands,

3

including COOL WATER, "because they are more frequently counterfeited . . . and because consumers expect the absolute best from [Davidoff's] luxury brands."  (Weissgraeber Aff. ¶ 6.)

Davidoff views the UPC system as "an important part of [its] programs regarding:  (i) anti-counterfeiting; (ii) worldwide quality assurance; and (iii) theft protection, investigation and prosecution."  (Baumgartner Aff. ¶ 5.)  Because counterfeit products either lack a UPC number altogether or repeat the same UPC number on multiple units, once Davidoff has identified counterfeit UPC numbers, it is often able "to differentiate an authentic product from a counterfeit quickly and easily – and to train investigators, Customs officials and law enforcement authorities to spot the fakes."[2]  (*Id.* ¶ 6.)

In the event that Davidoff becomes aware of a potential quality issue, the UPC also "enables [Davidoff] to pinpoint exactly where and when it arose and what other units are affected, if any, in [the] distribution chain."  (Weissgraeber Aff. ¶ 9.)  This use of the UPC is not merely pretextual; Davidoff and Coty Inc. have used this process to verify the safety and quality of COOL WATER fragrances (*id.* ¶ 10a), and to recall Davidoff and other fragrances in the past (*id.* ¶ 10).  The traceability provided by the UPC similarly assists Davidoff in its anti-theft measures and "greatly increases [the] chances of finding and taking action against the thieves, and possibly the distributors and retailers of the stolen . . . products."  (Baumgartner Aff. ¶ 15.)

C.  The TRO and CVS's Davidoff Inventory

Pursuant to the TRO, beginning in January 2007, Davidoff conducted inspections of CVS's inventory of COOL WATER products.  In total, Davidoff's inspectors examined 33,369

---

[2]In Davidoff's "experience, counterfeiters do not incur the expense of applying unique codes, so counterfeit DAVIDOFF products typically either have no code or display a repeated code . . . ."  (Baumgartner Aff. ¶ 11.)

units of COOL WATER fragrances.  Of these, 836 units were identified as counterfeit and 16,600 units were found to be decoded gray-market products.  (Andersen Aff., Ex. A; Pl.'s Ex. 10.)  According to James Duggan, one of the inspectors who examined the goods, the Unique Production Codes had been removed from the decoded goods using a number of different techniques, including:  i) cutting portions of the box or the label on the bottle to remove the UPCs; ii) using chemicals to wipe away the UPCs; and iii) grinding the UPCs from the bottom of the bottles.  (Duggan Aff. ¶ 15.)  In some cases, the packaging was damaged through the removal of the codes; in other cases, the boxes appeared to have been opened.  (*Id.* ¶¶ 15-16.)

## II.  CONCLUSIONS OF LAW

### A.  Standard of Review

#### 1.  Preliminary Injunction

"'To obtain a preliminary injunction a party must demonstrate: (1) that [he or she] will be irreparably harmed if an injunction is not granted, and (2) either (a) a likelihood of success on the merits or (b) sufficiently serious questions going to the merits to make them a fair ground for litigation, and a balance of the hardships tipping decidedly in its favor.'"  *Lusk v. Village of Cold Spring*, 475 F.3d 480, 485 (2d Cir. 2007) (quoting *Bronx Household of Faith v. Bd. of Educ.*, 331 F.3d 342, 348-49 (2d Cir. 2003)) (alterations in original).  In the context of the Lanham Act, "a showing of likelihood of [brand] confusion establishes both a likelihood of success on the merits and irreparable harm, assuming that plaintiff has a protectable mark."  *Ahava (USA), Inc. v. J.W.G. Ltd.*, 250 F. Supp. 2d 366, 369 (S.D.N.Y. 2003); *see also Hasbro, Inc. v. Lanard Toys, Ltd.*, 858 F.2d 70, 73 (2d Cir. 1988) ("In a Lanham Act case a showing of likelihood of confusion establishes both a likelihood of success on the merits and irreparable harm.").  Thus, here,

Davidoff need only show that CVS's sale of its gray-market goods creates a likelihood of brand confusion.

Although courts typically consider the *Polaroid* factors when considering the issue of likelihood of confusion, *see Polaroid Corp. v. Polarad Electronics Corp.*, 287 F.2d 492, 295 (2d Cir. 1961), in cases involving gray-market goods, a court will find a likelihood of confusion where the products are determined not to be "genuine" for the purposes of trademark infringement. *See Original Appalachian Artworks, Inc. v. Granada Elecs., Inc.*, 816 F.2d 68, 73 (2d Cir. 1987) (holding that dolls bearing the mark owner's trademark and manufactured by a licensee were not "genuine" because they were not authorized for sale in the United States and differed from the authorized dolls); *Ahava*, 250 F. Supp. 2d at 369 (discussing the different approaches to determining genuineness for trademark purposes).

### 2.  Trademark Infringement

"An action for trademark infringement arises where [a]ny person . . . without the consent of the registrant . . . use[s] in commerce any . . . registered mark in connection with the sale . . . of any goods . . . [and] such use is likely to cause confusion." *Warner-Lambert Co. v. Northside Dev. Corp.*, 86 F.3d 3, 6 (2d Cir. 1996) (quotations omitted). Because the sale of genuine goods is not likely to cause confusion, as "a general rule, trademark law does not reach the sale of genuine goods bearing a true mark even though the sale is not authorized by the mark owner. . . . In addition, even repackaging of goods is not trademark infringement if it does not deceive the public or damage the mark owner's goodwill." *Polymer Tech. Corp. v. Mimran* ("*Polymer I*"), 975 F.2d 58, 61-62 (2d Cir. 1992). "Goods, however, that do not meet the trademark owner's quality control standards will not be considered genuine goods, and their sale

will constitute trademark infringement." *Polymer Technology Corp. v. Mimran* ("*Polymer II*"), 37 F.3d 74, 78 (2d Cir. 1994); *see also Ahava*, 250 F. Supp. 2d at 369 ("[A] gray market good is not considered genuine if the goods do not meet the trademark owner's quality control standards."). As the Second Circuit has observed, "[o]ne of the most valuable and important protections afforded by the Lanham Act is the right to control the quality of the goods manufactured and sold under the holder's trademark." *El Greco Leather Prods. Co. v. Shoe World, Inc.*, 806 F.2d 392, 395 (2d Cir. 1986).

"For this purpose the actual quality of the goods is irrelevant; it is the control of quality that a trademark holder is entitled to maintain." *Id.* Moreover, "a trademark holder is not required to adopt the most stringent quality control procedures available," *Warner-Lambert*, 86 F.3d at 6, but is instead permitted to "make a business judgment" as to the type of procedures to implement, *id.* at 7. Applying these considerations, the Second Circuit has held that, to establish that a product is not genuine for the purposes of Lanham Act infringement, where a product does not meet the trademark holder's quality standards, a "trademark holder must demonstrate only that: (i) it has established legitimate, substantial, and nonpretextual quality control procedures, (ii) it abides by these procedures, and (iii) the non-conforming sales will diminish the value of the mark." *Id.* at 6.

B.  Likelihood of Success on the Merits

1.  The Alleged Infringement

Davidoff claims that CVS is violating the Lanham Act in two ways. First, Davidoff alleges that CVS sells counterfeit men's and women's Davidoff COOL WATER fragrances. According to Davidoff, these counterfeit goods "are not manufactured by Zino Davidoff, nor . . .

licensed, authorized, sponsored, endorsed or approved by Zino Davidoff or its licensees." (Am. Comp. ¶ 20.) As noted, CVS does not oppose a preliminary injunction enjoining the sale of such products.

Second, Davidoff alleges that CVS violates the Lanham Act through its sale of "decoded, gray-market" Davidoff goods. Gray-market goods are "goods that are manufactured abroad, are legally purchased abroad from authorized distributors, and are then imported by persons other than the trademark holder and without the markholder's permission." *Olympus Corp. v. United States*, 792 F.2d 315, 317 (2d Cir. 1986). For the purposes of this Motion, "decoded goods" are those goods whose UPC has been removed in some fashion.

As noted, Davidoff argues that removal of the UPCs impacts Davidoff's quality control procedures in three distinct ways: (i) it restricts Davidoff's ability to identify and remove counterfeit goods; (ii) it undermines Davidoff's ability to identify, inspect and, if necessary, recall defective product; and (iii) it limits Davidoff's anti-theft systems. (Supplemental Mem. of Law in Supp. of Pl.'s Mot. for a Prelim. Inj. ("Pl.'s Mem.") 15.). Standing alone, the first two of these considerations are sufficient to establish a likelihood of customer confusion and therefore to support a preliminary injunction. The Court, therefore, does not consider Davidoff's third claim regarding anti-theft measures.

### 2. Identification of Counterfeit Goods

The first two prongs of the *Warner-Lambert* test require Davidoff to show that its anti-counterfeiting procedures are "legitimate, substantial, and nonpretextual" and that "it abides by these procedures." *Warner-Lambert*, 86 F.3d at 6. These requirements are clearly satisfied here. Davidoff regularly works with and trains retailers, its own private investigators, and agents of the

United States Customs and Border Protection to identify and seize counterfeit goods. (Duggan Aff. ¶¶ 3-12.) No evidence has been presented that such procedures are pretextual or inconsistently applied. Thus, the first and second prongs of the *Warner-Lambert* test are satisfied.

Davidoff has also satisfied *Warner-Lambert*'s third prong, which requires a showing that the non-conforming sales will diminish the value of the mark. As Davidoff's expert on branding stated, "repeated inconsistent delivery in relation to that expected of a quality brand . . . inevitably result[s] in negative associations for consumers." (Joachimsthaler Aff. ¶ 24.) Applying this to the potential proliferation of counterfeit goods, "[w]hen a substantial number of counterfeit products infiltrate reliable retailers, consumers seriously question the reliability of the product and its channels of distribution. This element of uncertainty could significantly impact the DAVIDOFF brand." (*Id.* ¶ 27.) Thus, *Warner-Lambert*'s third prong is satisfied.

Here, however, the true point of contention is not whether the *Warner-Lambert* test is satisfied, but rather whether the test is properly applied to Davidoff's anti-counterfeiting system in the first instance. The Parties have cited, and the Court is aware of, no caselaw addressing whether an anti-counterfeiting system constitutes a "quality control procedure" as protected by the Lanham Act. Indeed, Davidoff conceded at oral argument that, with respect to its anti-counterfeiting efforts, it is asking the Court to extend the law, albeit by only "a baby step." (Hr'g Tr. 197.)

Whether as an extension of the law or simply as an application of existing law to a novel set of facts, the Court finds that Davidoff's anti-counterfeiting system is a species of quality control protected under the Lanham Act. As an initial matter, by reducing the availability of

counterfeit products of inferior quality, Davidoff's anti-counterfeiting procedures effectuate several goals central to the Lanham Act, including:  (i) protecting customers from confusion; (ii) ensuring product consistency for the benefit of consumers; and (iii) protecting trademark holders against misappropriation of their marks.  *See Inwood Labs., Inc. v. Ives Labs., Inc.*, 456 U.S. 844, 854 n.14 (1982) (noting that counterfeit goods undermine the Lanham Act's goal of preventing confusion by "depriv[ing] consumers of their ability to distinguish among the goods of competing manufacturers."); *ITC Ltd. v. Punchgini, Inc.*, 482 F.3d 135, 155 (2d Cir. 2007) (trademarks enable the "consuming public [to] rely with an expectation of consistency on the domestic reputation earned for the mark by its owner.") (quotations omitted); *Sterling Drug, Inc. v. Bayer AG*, 14 F.3d 733, 746 (2d Cir. 1994) (noting "the Lanham Act's goals of protecting American consumers against confusion, and protecting holders of American trademarks against misappropriation of their marks"); *Davidoff & Cie, S.A. v. PLD Int'l Corp.*, 263 F.3d 1297, 1301 (11th Cir. 2001) ("[T]rademark law ensures consistency for the benefit of consumers."); *Societe Des Produits Nestle, S.A. v. Casa Helvetia, Inc.*, 982 F.2d 633, 636 (1st Cir. 1992) ("By guaranteeing consistency, a trademark wards off both consumer confusion and possible deceit.").

Moreover, Davidoff's anti-counterfeiting system does control, even if indirectly, the quality of the products purchased by consumers seeking to buy Davidoff's goods.  Counterfeit COOL WATER goods are "of lower quality," lacking the complexity found in the genuine fragrance.  (Hr'g Tr. 70-71 (noting that "[w]ith a good product, you have a top smell, a heart note,[3] and a bottom note.  And all these develops [sic] together").)  The packaging of COOL

---

[3]This line in the hearing transcript reads "hard note," not "heart note."  However, by letter to the Court dated June 21, 2007, counsel for Davidoff corrected the transcript, noting that the witness had stated "heart note," meaning "the core of the fragrance."  CVS had no objection to

WATER counterfeits also is frequently inferior to that of the genuine product. (*Id.*)  Because the regulation of counterfeits helps to rid the market of these lower quality goods, thereby ensuring consistency in the quality of the products purchased by consumers seeking Davidoff products, Davidoff's anti-counterfeiting system serves to control quality.  This is important both to the consumer and to Davidoff.  As noted by Davidoff's expert, "imperfect packaging, poor spray delivery, [and] inconsistent fragrance between bottles" are likely to "lower[ Davidoff's] brand equity."  (Joachimsthaler Aff. ¶ 24.)  Davidoff therefore has a strong interest in controlling the quality of all goods in the marketplace bearing its mark – an interest that is protected by the Lanham Act.  *See Inwood Labs.*, 456 U.S. at 854 n.14 (noting that counterfeit goods "deprive[] the [trademark] owner of the goodwill which he spent energy, time, and money to obtain" in contravention of the Lanham Act).

      CVS argues that the gray-market fragrances that it has in its inventory do not include counterfeit product.  This claim, however, misses the point.  Plaintiff's witnesses persuasively testified that the decoded gray-market fragrances make detection of counterfeit products far more difficult, as counterfeiters have become more sophisticated in packaging fake COOL WATER products.  Yet, while the counterfeiters have become better at mimicking the bottles and boxes that Davidoff uses to sell its products, they have not mastered, or are not willing to go to the expense of mastering, Davidoff's UPC system.  Thus, by using the UPCs, Davidoff is able to more easily detect, and train others to more easily detect, counterfeit fragrances.  Put another way, when large batches of decoded product enter the market, even if the majority of that product is produced by Davidoff, counterfeiters can use the en masse sale of decoded products as cover

---

this correction.

for their illicit marketing efforts. And, while the use of UPCs may not be a perfect counter-measure, Davidoff's business judgment in adopting this expensive quality control measure is well within its right as the mark owner. *See Warner-Lambert*, 86 F.3d at 7.

Finally, the Court notes that, in other contexts, the Lanham Act provides strong protection against counterfeits. *See* 15 U.S.C. § 1114(1)(a) (prohibiting the "use in commerce any reproduction, counterfeit, copy, or colorable imitation of a registered mark"). Viewed in this light, the interpretation suggested by CVS would lead to an incongruous result: The Lanham Act would protect a quality control system aimed at ensuring the quality of goods actually produced by the trademark holder, but would leave wholly unprotected a system aimed at eliminating inferior goods made by a counterfeiter and illegally bearing the trademark holder's mark. The Court declines to adopt this stilted interpretation of the statute and Davidoff's motion therefore succeeds on this basis.[4]

### 3. Identification and Recall of Defective Product

Davidoff also argues that CVS should be enjoined from selling decoded gray-market goods because the decoded goods undermine Davidoff's ability "to address quality issues with Swiss precision in order to protect its goodwill and the public health and safety." (Pl.'s Mem. 15.) Defendant responds that: (i) the UPC system is not "integral" to Davidoff's quality control

---

[4]CVS also argues that customers are unaware of the existence and purpose of the Unique Product Code and therefore cannot be confused by its absence. (Hr'g Tr. 203.) But this argument also misses the mark. "Differences in quality control methods, although not always obvious to the naked eye, are nonetheless important to the consumer." *Nestle*, 982 F.2d at 643. And the very fact that the differences in packaging are subtle actually *increases* the likelihood of customer confusion: "[S]ubtle differences are . . . precisely the type that heighten the presumption of customer confusion, [as] [c]onsumers are more likely to be confused as to the origin of different goods bearing the same name when both goods are substantially identical in appearance." *Id.*

efforts (Mem. of Law in Opp'n to Pl. Zino Davidoff SA's Mot. for a Prelim. Inj. Regarding Gray Market Goods ("Def.'s Mem.") 11); (ii) Davidoff has never actually recalled any COOL WATER fragrances (*id.* at 12); and (iii) the UPC cannot serve as a means by which to report and identify defective product because Davidoff provides no contact information on its packaging (*id.* at 14). In short, CVS argues that Davidoff's quality control procedures are pretextual. Finally, CVS also argues that there are "superior alternatives" to the UPC system. (*Id.* at 13.)

Courts in the Second Circuit have refused to find Lanham Act violations where plaintiffs were unable to establish the existence of established and substantial quality control mechanisms related to the alleged trademark violation. This was the Second Circuit's reasoning in the *Polymer* cases. There, the maker of contact lens solution kits sold two types of kits. *Polymer I*, 975 F.2d at 60-61. One kit was intended for distribution by eye-care practitioners and the other for the retail market. *Id.* The two kits were presented in different packaging. *Id.* Plaintiff alleged that defendants violated its trademark when they sold the practitioner kits on the retail market. In *Polymer I*, the Second Circuit reversed the district court's denial of a preliminary injunction and remanded to permit plaintiff an opportunity to show that defendants' "repackaging interfered with its quality control efforts." *Id.* at 63. In *Polymer II*, the Second Circuit affirmed the district court's second denial of a preliminary injunction, finding that, *inter alia*, plaintiff "did not carefully police any procedures it may have had in place to ensure that the necessary information appeared on [its] packaging" and there was "no evidence that [plaintiff] had any quality control mechanism in place" relevant to its claims. 37 F.3d at 79.[5]

---

[5]Other Lanham Act decisions within the Second Circuit have turned on similar considerations. *See, e.g.*, *Warner-Lambert*, 86 F.3d at 7-8 (finding Lanham Act violation where defendant sold cough drops beyond the expiration date where plaintiff trademark holder had

Notably, however, to establish a Lanham Act violation, a plaintiff need not demonstrate that there are *actual* quality differences between the authorized goods and the gray-market goods; it is *the right* to control quality, rather than the quality itself that is protected under this test. *See El Greco*, 806 F.2d at 395 ("[T]he actual quality of the goods is irrelevant; it is the control of the quality that a trademark holder is entitled to maintain."); *Nestle*, 982 F.2d at 643 ("Regardless of the offending goods' actual quality, courts have issued Lanham Trade-Mark Act injunctions solely because of the trademark owner's inability to *control* the quality of the goods bearing its name."). Moreover, in the context of a quality control procedure involving product recalls, the "demonstration that there had been no actual recalls does not necessarily negate the plaintiffs' assertion that they had been maintaining their ability to recall as an integral part of their quality control effort protected by the Lanham Act." *John Paul Mitchell Sys. v. Pete-N-Larry's Inc.*, 862 F. Supp. 1020, 1026 (W.D.N.Y. 1994). Finally, as noted, the Second Circuit has held that the quality control procedures need not be perfect, as courts should defer to the business judgment of the mark owner in determining how to manage the quality control of its product. *See Warner-Lambert*, 86 F.3d at 7 ("A trademark holder is entitled, without losing its right to protect what value the mark has, to make a business judgment that additional quality control measures would add less value to the mark than their cost.").

---

extensive procedures to ensure the product's freshness); *El Greco*, 806 F.2d at 395-96 (2d Cir. 1986) (finding Lanham Act violation where defendant sold shoes that had not been inspected by plaintiff trademark holder); *Prince of Peace Enters. v. Top Quality Food Mkt.*, No. 07 Civ. 0349, 2007 WL 704171, at *4-5 (S.D.N.Y. Mar. 7, 2007) (finding no Lanham Act violation where quality control procedures consisted only of "periodic shelf inspections"); *Helene Curtis v. Nat'l Wholesale Liquidators*, 890 F. Supp. 152, 157-58 (E.D.N.Y. 1995) (finding Lanham Act violation where gray-market goods circumvented the quality control procedures put in place by plaintiff maker of hair-care products).

Here, contrary to CVS's claims, Davidoff's quality control system based on its UPC system is sufficiently legitimate, substantial, and nonpretextual so as to merit protection under the Lanham Act. The evidence establishes that Davidoff closely monitors customer and retailer complaints and uses the full traceability offered by the UPC system to quickly "identify and rectify possible quality issues with [its] fragrance products." (Weissgraeber Aff. ¶ 8.) Moreover, although Davidoff need not establish that it has used the UPC system to effectuate product recalls, on at least one occasion Davidoff has in fact recalled units of another Davidoff fragrance in response to a complaint; and in at least one other instance, based on a customer complaint, Davidoff was able to use its UPC system to investigate the quality of Davidoff COOL WATER units filled on a filling line on a particular date. (*Id.* ¶ 10.)

CVS argues that, because the Davidoff COOL WATER products do not contain contact information (such as an 800 number), customers will be unable to contact Davidoff in the event of a product defect and therefore the UPCs cannot possibly serve their purported purpose of assisting Davidoff in responding to customer complaints. But Davidoff's contact information can be found at its website, which is printed on the packaging of COOL WATER products, as well as through the retailers who sell Davidoff products, thus enabling customers to notify Davidoff when a defect is encountered. And even if customers were unable to contact Davidoff, the UPCs would still be integral to Davidoff's quality control efforts by allowing Davidoff to recall products that either it or its retailers had identified as defective.

The Court also rejects CVS's argument that the UPC system should not be protected because there are superior alternatives, such as date stamping the products. As an initial matter, it is unclear that CVS's suggestion of date stamping is, in fact, superior. Indeed, during oral

15

argument, CVS appeared to concede as much. (*See* Hr'g Tr. 222 ("[CVS doesn't] disagree that [a recall] would be more expeditious if the production code was on it, but [CVS doesn't] agree that they still couldn't do a recall . . . .").) In any event, the law does not require that Davidoff adopt the most effective quality control procedures possible, as courts are reluctant to inject themselves into such business judgments. *Warner-Lambert*, 86 F.3d at 6-7.[6]

Accordingly, Davidoff has established a likelihood of success on the merits on the basis of its quality control procedures.

### C. Irreparable Harm

Finally, the Court concludes that the Plaintiff has shown the irreparable harm necessary for injunctive relief. As noted, in the Second Circuit, a plaintiff "who establishes that an infringer's use of its trademark creates a likelihood of consumer confusion generally is entitled to a presumption of irreparable injury." *Weight Watchers Int'l, Inc. v. Luigino's, Inc.*, 423 F.3d 137, 144 (2005). Here, as discussed above, Plaintiff has established a likelihood of confusion by showing that the fragrances sold by CVS are not genuine, and Plaintiff has not delayed in seeking injunctive relief nor done anything else to defeat the presumption of irreparable injury. *See id.* at 144-45; *Tough Traveler, Ltd. v. Outbound Prods.*, 60 F.3d 964, 968 (2d Cir. 1995). Further, Plaintiff has affirmatively shown that it would face injury to its reputation if Defendant were to

---

[6]CVS also argues that Davidoff's UPC system should not be protected under the Lanham Act because its true purpose is to prevent the distribution of prestige Davidoff goods "outside of luxury department stores." (Def.'s Mem. 16.) This is a red herring. As an initial matter, this argument fails because the Court finds that Davidoff's quality control mechanisms are not pretextual. Moreover, CVS has brought no antitrust counterclaim, and it is at best questionable whether such a claim would succeed. *See Trans Sport, Inc. v. Starter Sportswear, Inc.*, 964 F.2d 186, 190 (2d Cir. 1992) ("A business may properly seek to maintain the image of its products by controlling where those products are sold, even if profit maximization is its ultimate objective.").

continue to sell counterfeit and non-genuine Davidoff products. Therefore, the Court finds that Plaintiff has established irreparable harm absent a preliminary injunction.

### III. Conclusion

For the foregoing reasons, Davidoff's Motion for a Preliminary Injunction is GRANTED. A separate Preliminary Injunction Order shall be issued apart from this Opinion.

SO ORDERED.

DATED:   New York, New York
         June **25**, 2007

                                                 KENNETH M. KARAS
                                          UNITED STATES DISTRICT JUDGE